**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

DEBRA K. HART,

                Plaintiff,

vs.

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL
SECURITY,

                Defendant.

No. C05-1020

**ORDER**

_____

      This matter comes before the court pursuant to briefs on the merits of this application for Title II Disability Insurance Benefits under the Social Security Act. The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). The court finds in favor of the plaintiff and against the defendant and the matter is remanded for an award of benefits.

## I. Procedural Background

      Claimant Debra Hart applied for Title II social security benefits on November 26, 2002, alleging an inability to work since January 18, 2002, due to heart problems, including mitral valve disease and severe leakage, shortness of breath, anemia, depression, and fatigue. The claimant's application was denied on March 3, 2003. The claimant filed a request for reconsideration on April 9, 2003. The request for reconsideration was also denied on June 20, 2003. The claimant, through her attorney, amended her disability onset date to February 25, 2003, consistent with her diagnosis of congenital heart disease. The claimant requested a hearing by an Administrative Law Judge (hereinafter "ALJ") on August 11, 2003, which was granted. A hearing before ALJ Lauren R. Mathon was held on August 18, 2004. ALJ Mathon denied benefits. On February 17, 2005, the Appeals

Council denied the claimant's request for review. Thus, ALJ Mathon's decision is the final decision of the Commissioner in this case.

## II. Factual Background

The claimant was born on September 21, 1955. (Tr. 64). She graduated high school and completed one year of college. (Tr. 84). The claimant had past relevant work experience as a factory worker. (Tr. 79). The claimant was last employed at the Woodform factory as a general laborer until January 18, 2002. (Tr. 91-92).

The claimant's relevant medical history began when visited her family doctor, Dr. Roger Waller, on October 2, 2001 at the Maquoketa Family Clinic. (Tr. 177). The claimant complained of fatigue, poor sleep, and increased depression. Dr. Waller diagnosed the claimant with depression and prescribed 20 mg of Prozac. (Tr. 177). When the claimant returned for her follow-up appointment for depression she stated that the Prozac was not helping and that her depression had not improved since her last visit. (Tr. 176). Dr. Waller increased the claimant's Prozac prescription to 40 mg daily. (Tr. 176).

On January 11, 2002, the claimant saw Dr. Waller for a second depression follow-up. (Tr. 176). The claimant said her depression had not changed and noted that she was not sleeping very well and was often tired. (Tr. 176). Dr. Waller noted a history of anemia and increased the claimant's Prozac prescription. (Tr. 176).

The claimant visited Dr. Waller on February 14, 2002, complaining of a persistent cough and fever. (Tr. 175). Dr. Waller noted that the claimant's lungs were slightly coarse bilaterally and prescribed an antibiotic. (Tr. 175). The claimant returned to Dr. Waller's office on February 20th with a continued cough and fever. (Tr. 175). Dr. Waller diagnosed the claimant with bronchitis with a continued cough and scheduled a chest x-ray. (Tr. 175).

The claimant's chest x-ray showed mild chronic appearing interstitial prominence. (Tr. 174). Dr. Waller noted that there appeared to be some scarring on the claimant's lungs and advised her to stop smoking. (Tr. 174). The claimant's blood tests showed low

hemoglobin and anemia and she exhibited shortness of breath. (Tr. 173). Dr. Waller recommended that the claimant be referred to a pulmonologist. (Tr. 173).

On March 26, 2002, the claimant visited Dr. Waller complaining of edema in her extremities. (Tr. 172). Dr. Waller did not observe much swelling except a trace amount around the malleolus bilaterally. (Tr. 172). Dr. Waller attributed the swelling to the claimant's salt intake and encouraged her to drink water to reduce the swelling. (Tr. 172).

A second chest x-ray was performed on March 28, 2002. (Tr. 172). Dr. Waller diagnosed mild diffuse prominence of the interstitial marking with a differential diagnosis of lung interstitial disease from chronic exposure to organic and inorganic dust, chronic smoking, chronic inflammatory process, sarcoidosis, or tuberculosis. (Tr. 172).

The claimant went to a consultation with Dr. Badar Kanwar, a pulmonary specialist, on referral from Dr. Waller on March 29, 2002. (Tr. 217-19). Dr. Kanwar observed that the claimant had suffered from a chronic cough for the past nine to ten months and opined that due to the claimant's history of chronic tobacco abuse, this was most likely suggestive of underlying chronic obstructive lung disease. (Tr. 217). He also noted that the claimant had a history of recurrent wheezing, which may have been suggestive of asthmatic bronchitis. (Tr. 217). Dr. Kanwar also noted that the claimant's leg edema caused an inability to sleep flat. (Tr. 217). He stated that the claimant was also having difficulty sleeping due to chest tightness and a "choking feeling". (Tr. 217). Dr. Kanwar observed that the claimant's chest x-ray showed the possibility of redistribution of pulmonary vascularity to the upper lobes, suggestive of congestive heart failure. (Tr. 217).

On March 30, 2002, the claimant went to the emergency room at the Jackson County Public Hospital because of swelling in her ankles and shortness of breath. (Tr. 161). Nurse Debra Marcus observed that the claimant was very anxious and tearful and that her husband answered most of the questions. (Tr. 161). Ms. Marcus noted that the claimant became irritated when asked to give her pain level, tore off the blood pressure cuff, and threatened to leave the hospital. (Tr. 161). Upon examination, Ms. Marcus found no evidence of edema in the claimant's ankles. (Tr. 161). The claimant exhibited

crampy pain from her knees distally in both legs. (Tr. 161). When Dr. Randy Robinson arrived and began to question the claimant about her medical history, the claimant became upset and decided to leave the emergency room against medical advise. (Tr. 161).

The claimant was referred to a cardiologist, Dr. J. Randolph Lewis, by Dr. Kanwar. She underwent an echocardiogram on April 3, 2002. (Tr. 266). Dr. Lewis noted some increased thickening and calcification of the mitral valve leaflets and an enlarged left atrium. (Tr. 266). Dr. Lewis also found severe mitral regurgitation and some turbulence in diastole across the mitral valve, consistent with mitral stenosis. (Tr. 266). He noted that the claimant's mitral valve had a characteristic diminished E to F slope, consistent with rheumatic mitral stenosis, with some calcification and fibrosis. (Tr. 266). Finally, Dr. Lewis noted moderate to severe tricuspid regurgitation. (Tr. 266). Dr. Lewis diagnosed mild to moderate mitral stenosis, severe mitral regurgitation with a thickened, moderately calcified mitral valve, consistent with mitral valve disease. He also found mild dilation of the left atrium and mild to moderate pulmonary hypertension. (Tr. 266). Dr. Lewis recommended further testing including a transesophageal echocardiogram and a stress test. (Tr. 264).

On April 12, 2002, the claimant's husband called Dr. Waller to report that the claimant had been admitted to a psychiatric clinic in Florida due to a mental breakdown she suffered while on vacation. (Tr. 171).

The claimant visited Dr. Waller on May 3, 2002, complaining of continued peripheral edema. (Tr. 170). Dr. Waller noted that he could not see much swelling in the claimant's extremities, but proscribed Lasix and Potassium to reduce her discomfort. The claimant's mother accompanied the claimant and told Dr. Waller that the claimant seemed to be quite depressed and was not sleeping well at night. (Tr. 170).

The claimant saw psychiatrist Dr. G. Narayana on May 10, 2002. (Tr. 224-25). While Dr. Narayana's notes are generally illegible, he described the claimant as moody and anxious and noted a family history of depression and suicide. (Tr. 224). Dr. Narayana diagnosed the claimant with bipolar disorder and paranoia. (Tr. 225).

Dr. Narayana again saw the claimant on May 17, 2002, where he noted that she spoke slowly and with major effort. (Tr. 223). He also noted that the claimant was still in grief over her father's death. (Tr. 223). Dr. Narayana saw the claimant on May 30, June 28, and September 30, 2002. (Tr. 220-22).

On June 6, 2002, the claimant underwent a transesophageal echocardiogram at the request of Dr. Lewis. (Tr. 255). It was found that the claimant's right atrium was moderately enlarged and her left atrium was severely enlarged. (Tr. 255). The claimant's mitral valve was found to be myxomatous and appeared to have a prolapse of the anterior leaflet. (Tr. 255). She also showed some restrictions systolically excursion of the leaflets, consistent with mitral stenosis, severe mitral regurgitation, and mild to moderate tricuspid regurgitation. (Tr. 55).

The claimant underwent a stress test on June 27, 2002. (Tr. 246-48). The claimant showed symptoms of moderate dyspnea during exercise, which improved during the recovery period. (Tr. 247). Dr. Lewis noted that the stress test indicated that it was unlikely that the claimant had any significant coronary artery disease. (Tr. 246). Dr. Lewis recommended a complete right and left heart catheterization with a coronary arteriogram prior to making a decision about mitral valve replacement. (Tr. 246).

A chest x-ray was taken on July 17, 2002. (Tr. 157). The x-ray was requested by Dr. Lewis and reviewed by radiologist Dr. Edward Hannon. (Tr. 157). The x-ray showed clear lungs with no pleural thickening or effusion. Dr. Hannon noted that the increased interstitial markings found on the claimant's February 2002 chest x-ray had cleared. (Tr. 157). Thus, Dr. Hannon determined that this interstitial pattern was not a chronic fibrosis, but a transient infectious or inflammatory condition. (Tr. 157).

The claimant's catheterization was performed on July 19, 2002. (Tr. 239-44). Dr. Lewis found moderate to severe mitral regurgitation with enlargement of the left atrium, mild elevation of pulmonary capillary wedge pressure, and mild to moderate mitral stenosis. (Tr. 243). Dr. Lewis recommended that the patient undergo periodic echocardiograms in order to determine at what point she would need mitral valve repair

or replacement. (Tr. 244). Dr. Lewis noted, "[a]t the current symptomatic level, unless she should find her current status of exercise capability intolerable, I would recommend following the patient conservatively, watching for signs and symptoms of heart failure and echocardiographically for signs of left ventricular dilation." (Tr. 237).

The claimant saw Dr. Kanwar, her pulmonologist, on September 17, 2002, to discuss the results of her pulmonary function testing. (Tr. 213). The claimant complained that she was still experiencing shortness of breath with activity and high humidity. (Tr. 213). Dr. Kanwar noted that her pulmonary function testing showed only mild obstructive lung disease and prescribed Advair to improve her breathing. (Tr. 213).

The claimant had a follow-up appointment with Dr. Kanwar on October 28, 2002. (Tr. 210). The claimant stated that her shortness of breath symptoms were quite a bit better, but she was experiencing chest pains, mainly during activity, that lasted for a couple of minutes. (Tr. 210). Dr. Kanwar prescribed nitro for the claimant's chest pain and encouraged her to quit smoking. (Tr. 210).

The claimant was seen by Dr. Lewis for a follow-up appointment on November 11, 2002. (Tr. 235). Dr. Lewis noted that the patient was experiencing more chest discomfort since her last visit. (Tr. 235). He also stated that because the claimant had some chronic dental issues, they would need to be resolved before she had any mitral valve replacement surgery. (Tr. 235). Dr. Lewis also stated:

> Mrs. Hart seems symptomatically to be doing about the same. Her increasing exertional chest discomfort remains difficult to explain, given her normal coronary arteriogram, although this could be related to a significant increase in pulmonary artery pressure, and right ventricular ischemia as a result of that. Given her relatively normal hemodynamics during the time of cardiac catheterization, although this was at rest, I think that this might be somewhat unlikely, although certainly not impossible.

(Tr. 236). Dr. Lewis referred the claimant to a cardiac surgeon and recommended that the claimant clear up her dental issues. (Tr. 236).

On November 26, 2002, the claimant applied for disability insurance benefits. (Tr. 64-66). A field report was prepared by claims representative Beth Dardis on that date. (Tr. 73-76). Ms. Dardis met with the claimant in person and noted that she had difficulty understanding, concentrating, and answering. (Tr. 75). Ms. Dardis noted that the claimant's mother accompanied her and answered most of the questions. (Tr. 75). Ms. Dardis also observed that the claimant was very vague and seemed "confused and bewildered." (Tr. 75).

In conjunction with her application, the plaintiff filled out a disability report, a chest pain questionnaire, and a daily activities questionnaire. (Tr. 77-86, 99-104). The claimant stated that her heart disease, shortness of breath, depression, and stress limit her work because she became tired easily, had sharp chest pains, suffered from shortness of breath, and lacked concentration. (Tr. 78). The claimant stated that she suffered from sharp, stabbing pain on the left side of her chest, which lasted for two to three minutes at a time. (Tr. 99). She explained that these pains were brought on by exertion, exposure to cold air, and hurrying. (Tr. 99). She also noted that she could only walk for three blocks without getting short of breath and needing to stop. (Tr. 100). She stated that the pain is relieved by resting for a short while. (Tr. 100). The claimant complained of difficulty sleeping because her legs bothered her at night. (Tr. 101). For her daily activities the plaintiff noted that she did laundry, washed dishes, and cooked two meals a day regularly; changed sheets, ironed, took out the trash, did home repairs, raked leaves, and did other garden work rarely; and vacuumed and washed her car with help or reminders. (Tr. 101). The claimant noted that she had problems completing chores because she got distracted, tired easily, and became short of breath. (Tr. 101). The claimant stated that she needed help grocery shopping, paying bills, and going to medical appointments. (Tr. 102). The claimant noted that she had a lot of problems concentrating and remembering. (Tr. 104). She stated that she became stressed and overwhelmed and got distracted when trying to complete a task or follow directions. (Tr. 104).

The claimant's mother, Shirley Cummins, also completed a third party activities questionnaire regarding her daughter. (Tr. 87-90). She noted many of the same problems as the claimant. Ms. Cummins stated that the claimant was very slow when completing chores and had difficulty staying motivated. (Tr. 88). She noted that the claimant had problems with grocery shopping, paying bills, and taking her medication, due to her difficulty with memory and keeping things straight. (Tr. 88). She also noted that the claimant had a lot of difficulty concentrating and remembering, adapted very poorly to change, and had difficulty making decisions. (Tr. 90).

The claimant's application for disability benefits was denied on November 26, 2002 by a social security examiner. (Tr. 36-40). The examiner found that while the claimant did have chest pain, recent tests had been normal. (Tr. 38). In addition, the examiner noted that the claimant's shortness of breath problem had been stabilized due to medication. (Tr. 38). The examiner stated that while the claimant may have been experiencing some fatigue due to anemia, she was able to care for her own personal needs. (Tr. 38). As for the claimant's problems with depression, the examiner found that because she was able to follow instructions and complete assigned tasks and could perform many daily activities, she could perform work similar to her past job as a pillow packager. (Tr. 38-39).

A social security medical consultant, Dr. Lawrence F. Staples, completed a Residual Functional Capacity Assessment (hereinafter "RFC") on January 14, 2003. (Tr. 122-30). Dr. Staples found that the claimant had the following exertional limitations: occasionally lift 20 pounds; frequently lift ten pounds; stand or walk for six hours in an eight-hour workday; push or pull unlimited; climb ramps or stairs, stoop, kneel, crouch, crawl occasionally; and balance frequently. (Tr. 124). Dr. Staples also stated that the claimant needed to avoid concentrated exposure to extreme cold and heat, humidity, fumes, odors, dusts, gases, poor ventilation, etc. (Tr. 126). Dr. Staples found that the claimant suffered from mitral valve disease with moderately severe regurgitation with some stenosis. (Tr. 130). He noted that the impairment is severe. (Tr. 130). Dr. Staples stated

that the file showed that the claimant had some shortness of breath with exertion, a Grade III systolic murmur and opening snap and diastolic rumble. (Tr. 130). He noted that her echocardiogram showed normal left ventricular size and function with severe mitral regurgitation and mitral valve prolapse of the inferior leaflet with myxomatous change, some mitral stenosis, and coronary anteriography right and left. (Tr. 130). Dr. Staples found that her pulmonary condition was stable. (Tr. 130).

On January 27, 2003, the claimant underwent a psychodiagnostic mental status exam performed by Barbara J. Lips, Ph.D. (Tr. 131-34). Dr. Lips noted that the claimant reported two psychiatric hospitalizations, one in 2002 and one in the 1980s. (Tr. 131). The claimant also reported to Dr. Lips that she had been seen at the Gannon Center for Community Mental Health in 2000 and 2001, and was currently being seen by Dr. G. Narayan in the Quad Cities. (Tr. 131). The claimant, at the time, was taking Seroquel, Lorazepam, and Fluoxetine for her psychiatric problems. (Tr. 131). Dr. Lips observed that the claimant's speech was "somewhat hesitant, rather ruminative, with longer response latencies. She would frequently ask that questions be repeated." (Tr. 132-33). Dr. Lips noted that the claimant showed no signs or symptoms of psychosis, was coherent, logical, and goal directed. (Tr. 133). She stated that the claimant appeared to be functioning in the average range of general intellectual ability, her recent memory was intact, and her remote memory appeared within normal limits. (Tr. 133). Dr. Lips noted that the claimant had some difficulty performing tests. (Tr. 133). When asked to state the date, the claimant had to be prompted with each element. (Tr. 133). The claimant performed the Reverse Serial Sevens slowly, but correctly, aside from one self-corrected error. (Tr. 133). The claimant was able to name simple common objects, repeat a simple phrase, follow a simple three-stage oral command, and follow a simple written command. (Tr. 133). Dr. Lips made the following DSM-IV diagnostic impressions: (1) Major Depressive Disorder, recurrent, moderate, with features of anxiety; (2) Dependent Traits, rule out Dependent Personality Disorder; (3) GAF of 56. (Tr. 133-

34). Dr. Lips made the following findings as to the claimant's limitations in work-related activities:

> She appears to be of average intelligence and capable of remembering and understanding instructions, procedures, and locations. Symptomatically, she is having some difficulty with attention and concentration, and also exhibits some psychomotor retardation, which would reduce her ability to carry out instructions at an optimal level. At the present time, she would have some difficulty interacting appropriately with supervisors, co-workers, and the public. She is able to use good judgment, but would need time and support in responding appropriately to changes in the workplace.

In response to Dr. Lipps' findings, a psychiatric review was performed by Dr. Beverly Westra, a social security program doctor. (Tr. 135-53). Dr. Westra found that the claimant had major depressive disorder. (Tr. 138). Dr. Westra also noted that the claimant exhibited dependent traits. (Tr. 142). Dr. Westra determined that the plaintiff had a mild restriction of activities of daily living; moderate difficulty in maintaining social functioning; and moderate difficulty in maintaining concentration, persistence, or pace. (Tr. 145) As a part of her evaluation, Dr. Westra completed a mental RFC assessment of the claimant. (Tr. 149-50). Dr. Westra found that the claimant was moderately limited in the following areas: (1) her ability to understand and remember detailed instructions; (2) her ability to carry out detailed instructions; (3) her ability to maintain attention and concentration for extended periods; (4) her ability to work in coordination with or proximity to others without being distracted by them; (5) her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (6) her ability to accept instructions and respond appropriately to criticism from supervisors; and (7) her ability to respond appropriately to changes in the work setting. (Tr. 149-50). In the remaining areas of ability, Dr. Westra found the claimant not significantly limited. (Tr. 149-50). Dr. Westra concluded that the claimant's impairments were severe, but not of listing level severity. (Tr. 153). She found that the

evidence supported moderate cognitive and social restrictions. (Tr. 153). She also noted that the claimant would have problems consistently performing complex or highly detailed tasks. (Tr. 153). Finally, Dr. Westra noted that the claimant appeared to have some difficulty responding to criticism and adapting to change. (Tr. 153).

The claimant had a consultation with cardiac surgeon Dr. Shauna Roberts on February 20, 2003. (Tr. 231-33). Dr. Roberts noted that the claimant stated that she could not vacuum her house without becoming tired and experienced sharp, mid-sternal chest pain, which was worse with exertion. (Tr. 231). The claimant also told Dr. Roberts that she had nosebleeds frequently, which lasted intermittently all day long. (Tr. 231). The claimant stated that she coughed up blood and that her shortness of breath had improved. (Tr. 231). Dr. Roberts noted that the claimant would need dental clearance prior to surgery. (Tr. 233). Dr. Roberts also stated that the claimant would not be eligible for the most optimal replacement of a mechanical valve because of problems with her need for anticoagulation and her nosebleeds. (Tr. 233). Dr. Roberts opined that the claimant's mitral valve was probably not repairable. (Tr. 233). Dr. Roberts stated that the claimant would eventually require mitral valve surgery, which would be necessary when her symptoms progressed to dyspnea on exertion, or when she showed clinical parameters of LV dilation or a decrease in ejection fraction. (Tr. 233).

The claimant requested a reconsideration of her disability determination on April 9, 2003. (Tr. 105-08). In her reconsideration disability report, the claimant noted that she was having more chest pain and nose bleeds, her arm was going numb, she felt faint at times, and was experiencing back aches. (Tr. 105). She noted that because of her conditions she experienced shortness of breath and became tired easily; she became confused at times and stressed. (Tr. 105).

In response to this application for reconsideration, a second psychiatric review was performed by a social security program doctor, Dr. Philip R. Laughlin. (Tr. 182-96). Dr. Laughlin based his findings on the claimant and her mother's daily activities reports, Dr. Lips' psychiatric exam, and other medical assessments and treating sources.

(Tr. 196). Dr. Laughlin found that the claimant suffered from depression and dependent traits. (Tr. 185, 189). Dr. Laughlin noted that the claimant had mild limitation in restricting activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 192). He noted that on reconsideration, the claimant was not alleging any worsening of mental impairment. (Tr. 196). Dr. Laughlin found that the evidence in the file was consistent with the allegations, and there were no inconsistencies across sources of information. Dr. Laughlin noted that the claimant's allegations were credible to the extent that she was limited in his Mental RFC assessment. (Tr. 196).

In his RFC, Dr. Laughlin determined that the claimant was moderately limited in the following areas: (1) her ability to understand and remember detailed instructions; (2) her ability to carry out detailed instructions; (3) her ability to maintain attention and concentration for extended periods; (4) her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (5) her ability to work in coordination with or proximity to others without being distracted by them; (6) her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (7) her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (8) her ability to respond appropriately to changes in the work setting. (Tr. 179).

On May 29, 2003, the claimant saw her pulmonologist, Dr. Kanwar, with complaints of generalized tiredness and fatigue and uncomfortable feelings in her leg that caused a need to move them constantly. (Tr. 209). The claimant also stated that she did not like her psychiatrist and wanted Dr. Kanwar to address her psychiatric problems in the future. (Tr. 209). Dr. Kanwar diagnosed the claimant with restless leg syndrome and gave her a prescription for Mirapex. (Tr. 209). As for her psychiatric treatment, Dr. Kanwar suggested the claimant stop taking Prozac and continue with Seroquel and Ativan. (Tr. 209). He also described a plan to begin taking her off the medication

because he thought her anxiety problem was related to her medical problems in the previous year. (Tr. 209).

Also on May 29, 2003, the claimant underwent an echocardiogram. (Tr. 261-63). Dr. Lewis noted that there was no significant change from the cardiogram done in 2002. (Tr. 260). Dr. Lewis found moderate rheumatic mitral stenosis with moderate to severe eccentric mitral regurgitation, moderate pulmonary hypertension, and bilateral enlargement. (Tr. 260).

The claimant's request for reconsideration of her disability determination was denied on June 20, 2003. (Tr. 37, 44-46). The social security examiner found that the results of the claimant's most recent echocardiogram were similar to her last one, thus there was no worsening of the claimant's mitral valve disease. (Tr. 44). The examiner noted that the claimant's problems with shortness of breath were improved with treatment for pneumonia. (Tr. 44). The examiner stated that the claimant had mild COPD and mild anemia. (Tr. 44). The examiner noted that there was no indication that the claimant's chest pains had continued. (Tr. 44-45). The examiner also stated that the claimant's daytime tiredness and fatigue were due to restless leg syndrome and disturbed sleep, for which the claimant was treated with medication. (Tr. 45). As to the claimant's depression, the examiner noted that it does not interfere with her ability to perform complex tasks and carrying out simple instructions. (Tr. 45). The examiner found that the claimant should be capable of performing work which would not require much strenuous physical activity and would be able to return to her past work as a pillow packager. (Tr. 45).

On June 26, 2003, the claimant visited Dr. Kanwar complaining of daytime tiredness and fatigue, though she noted she was sleeping better after taking Mirapex for her restless leg syndrome. (Tr. 208). Dr. Kanwar noted a need to rule out sleep apnea. (Tr. 208). As a result, the claimant participated in a sleep study on August 7, 2003. (Tr. 206-07). The claimant exhibited mild obstructive sleep apnea and, because of her cardiac problems, Dr. Kanwar decided to proceed with a CPAP titration study. (Tr. 205, 207). The study was conducted on September 15, 2003. (Tr. 286-87). The results

showed that the claimant had mild obstructive sleep apnea with a slightly reduced sleep efficiency of 81%. (Tr. 286). Dr. Kanwar recommended that the claimant use a CPAP at night to treat her sleep apnea. (Tr. 284).

The claimant's cardiologist, Dr. Lewis, completed a cardiac RFC assessment regarding the claimant on April 18, 2004. (Tr. 270-73). Dr. Lewis diagnosed the claimant with severe mitral regurgitation and moderate to severe mitral stenosis and assessed a New York Heart Association functional classification of two to three. (Tr. 270). He stated that the claimant's symptoms were chest pain, shortness of breath, edema, and dyspnea. (Tr. 270). He found that the claimant had moderate limitation of physical activity. (Tr. 270). Dr. Lewis recommended that the claimant work only in jobs that included moderate stress. (Tr. 271). He stated that the claimant's physical symptoms did not cause emotional difficulties and that emotional factors did not contribute to the severity of the claimant's cardiac symptoms and functional limitations. (Tr. 271). Dr. Lewis noted that the claimant's cardiac symptoms would seldom be severe enough to interfere with her concentration and attention. (Tr. 271). He noted that the claimant would need mitral valve replacement and that her impairments could be expected to last at least twelve months. (Tr. 272). Dr. Lewis found that the claimant could walk two blocks without rest or severe pain, but declined to state the amount of time she could sit/stand during an eight hour workday and how often she would need breaks. (Tr. 272). Dr. Lewis stated that the claimant could lift ten pounds frequently, 20 pounds occasionally, and 50 pounds never. (Tr. 272). Dr. Lewis recommended the claimant avoid concentrated exposure to extreme cold and heat and avoid even moderate exposure to fumes, odors, dusts, gases, and hazards. (Tr. 273). He noted that the claimant was likely to experience goods days and bad days and would likely have to miss work about two days per month as the result of impairments or treatment. (Tr. 273).

On May 10, 2004, the claimant was seen for a follow-up examination by Dr. Lewis. (Tr. 274-75). Dr. Lewis noted that the claimant had half of her teeth removed and would soon be having the other half removed. (Tr. 274). He stated that this would reduce her

chances of having prosthetic endocarditis following her surgery. (Tr. 274). He noted that the claimant had some swelling of her ankles and started her on diuretic therapy. (Tr. 274). Dr. Lewis performed an echocardiogram and, although he noted no significant change from her 2003 echocardiogram, opined that the claimant may have been nearing the time when mitral valve replacement would need to be carried out. (Tr. 275).

The claimant saw Dr. Kanwar for a follow-up visit for her pulmonary and psychiatric problems on June 28, 2004. (Tr. 278). The claimant complained of being tired all the time and aching legs. (Tr. 278). She also complained of increased depression due to her dental procedures. (Tr. 278). Dr. Kanwar noted the claimant was experiencing shortness of breath and chest discomfort occasionally and with exertion and had edema of the legs. (Tr. 278). The claimant was also having problems with claustrophobia when wearing her CPAP for sleep apnea treatment. (Tr. 280).

A hearing was held before ALJ Mathon to determine the claimant's disability status. (Tr. 292). At the hearing, ALJ Mathon first heard testimony from medical expert Dr. David West. (Tr. 294-305). Dr. West explained that the claimant had rheumatic mitral vale disease and moderate to severe mitral regurgitation. (Tr. 297). Dr. West testified that the indications for meeting the listings and the indications for surgery are the same - if you meet the listing, it would mean that it is time for surgery. (Tr. 297). However, Dr. West noted that if there was another reason that surgery had not been scheduled, such as a financial problem or another medical problem that precluded surgery, then it might not automatically mean that the claimant had not met the listings. (Tr. 298). Dr. West testified that the claimant did not meet the listings because she did not have heart failure, chest pain, arrhythmia, or CNS. (Tr. 299). Dr. West also testified that the claimant did not equal the listings because her impairments were not yet severe enough to justify replacement of the valve, although he noted that the claimant's doctors had acknowledged that she would need surgery at some point. (Tr. 299). Dr. West testified that he disagreed with Dr. Lewis' RFC assessment because he did not think that the claimant's cardiac problem was of such severity that she would be absent from work two

days per month.  (Tr. 300).  Dr. West again based this opinion on the fact that the claimant was not scheduled for surgery.  (Tr. 300).  Dr. West stated, "[I]f her, her cardiac problem is of such severity that she can't work because she would be absent two days a month, then it's time for surgery. . . ."  (Tr. 300).  However, Dr. West also noted that he was not qualified to discuss the claimant's psychiatric problems, which could have been the basis for Dr. Lewis' limitation.  (Tr. 300).  Dr. West also explained that the assessment could be the result of some embellishment on the part of Dr. Lewis.  Dr. West testified:

> Doctors are hired by patients to make them better and to do their bidding, and just like a lawyer, they are patient advocates, and it may be that that's a factor here; or it may be that's psychiatric.  And I don't fault the doctor for that.  I certainly did the many years I filled out these forms when I was in practice.  I embellished the same, the same diagnosis -- for one patient you'd say, this guy can go to work, no problem.  But if he says, I don't want to work anymore, I'd say, okay, this patient can't work.  That's, that's what doctors do.  They're not judges.

(Tr. 301).  The claimant's attorney questioned Dr. West about Dr. Lewis' assessment of the claimant's heart problem as a New York Heart Association function class of two to three.  (Tr. 303).  Dr. West stated that class three is a person who is symptomatic with just mild exercise.  (Tr. 303).  Dr. West further testified that he thought the claimant was closer to a class three than a class two and that he would have limited her a little more than Dr. Lewis.  (Tr. 303-05).

The claimant also testified at her hearing.  (Tr. 306-24).  The claimant testified that her heart problem affected her on a daily basis because it caused her ankles to swell.  (Tr. 307).  The claimant stated that she sat in a recliner and elevated her legs to reduce the swelling for about a half an hour, three to four times a day.  (Tr. 307-08).  She stated that she could be on her feet for about 45 minutes in between resting and elevating.  (Tr. 320).  The claimant testified that she had problems sitting in an upright chair and would have to get up after an hour to two hours of sitting.  (Tr. 321).  She also stated that she became short of breath when she vacuumed and walked up and down stairs.  (Tr. 309).  The

claimant testified that she was able to wash dishes, make the bed, and do laundry on a regular basis. (Tr. 309). She also testified that she experienced a lot of daytime fatigue and had to sit down three to four times a day to rest. (Tr. 311-12). The claimant explained her depressive symptoms as "feel[ing] down all the time, and feel[ing] like everything is blah," and noted that she had difficulty paying attention and relating to others. (Tr. 313-14).

A vocation expert, Ruth VanVleet, also testified at the ALJ hearing. (Tr. 324-36). ALJ Mathon asked Ms. VanVleet to rate the claimant's past work in terms of exertion and skill. (Tr. 327). Ms. VanVleet testified that the claimant's assembly work, general labor, and woodwork are unskilled light jobs. (Tr. 327). She testified that machine operating is a medium semiskilled job. (Tr. 327). She also testified that the assembly jobs performed by the claimant that included inspection were sedentary semiskilled jobs. (Tr. 328).

ALJ Mathon proposed a hypothetical to Ms. VanVleet concerning a person with the claimant's age, work experience, background, and the following limitations: (1) can frequently lift 10 pounds; (2) can occasionally lift 20 pounds; (3) must avoid concentrated exposure to extreme cold and extreme heat; and (4) must avoid even moderate exposure to fumes, odors, hazards, machinery, and heights. (Tr. 328). Ms. VanVleet testified that a person with those limitations would not be able to perform any of the claimant's past jobs because they all involved either fumes, cold, or heat. (Tr. 329). Ms. VanVleet further testified that, with these limitations, the claimant could work the job of a ticket taker in a climate controlled area, which is an unskilled light job with 702 positions in Iowa and 112,000 positions nationally. (Tr. 331). She also testified that the claimant could perhaps do electronic assembly because it was in a clean environment. (Tr. 333). She stated that she did not have the number of positions in Iowa, but there were 502,000 positions nationally. (Tr. 334).

ALJ Mathon proposed a second hypothetical in which she added moderate limitations on concentration and social interaction. (Tr. 334). Ms. VanVleet testified that

these limitations would not preclude jobs as a ticket taker or electronic assembly. (Tr. 334). ALJ Mathon then added the limitation to the hypothetical that the person would need to change her position at will. (Tr. 334). Ms. VanVleet responded that this could impair the person's ability to keep up with production levels if she needed to change position so frequently that she was unable to maintain the pace of the work. (Tr. 334-35).

On examination of Ms. VanVleet by the claimant's attorney, he proposed an alternate hypothetical, adding the following restrictions to the hypothetical proposed by ALJ Mathon: (1) moderate limitation in the ability to understand and remember detailed instructions; (2) moderate limitations in the ability to carry out detailed instructions; (3) moderate limitation in the ability to maintain attention and concentration for extended periods; (4) moderate limitation in the ability to work in coordination with or proximity to others without being distracted by them; (5) moderate limitation in the ability to accept instructions and respond appropriately to criticism from supervisors; (6) moderate limitation in the ability to respond appropriately to changes in the work setting; and (7) moderate limitation in the ability to complete a normal workday and workweek without interruption from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 335). Ms. VanVleet testified that these impairments, taken together, would render a person unemployable because it would impact her speed level of work and because she would not be able to maintain a job on a competitive basis. (Tr. 336).

### III.  Conclusions of Law

#### A.  Scope of Review

In order for the court to affirm the ALJ's findings of fact, those findings must be supported by substantial evidence appearing in the record as a whole. See Lochner v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989). Substantial evidence is more than a mere scintilla. It means relevant evidence a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1997); Cruse, 867 F.2d at 1184; Taylor v. Bowen, 805 F.2d

329, 331 (8th Cir. 1986). The court must take into account evidence which fairly detracts from the ALJ's findings. Cruse, 867 F.2d at 1184; Hall v. Bowen, 830 F.2d 906, 911 (8th Cir. 1987). Substantial evidence requires "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." Cruse, 867 F.2d at 1184 (quoting Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966)). The court must consider the weight of the evidence appearing in the record and apply a balancing test to contradictory evidence. Gunnels v. Bowen, 867 F.2d 1121, 1124 (8th Cir. 1989); Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).

## B. ALJ's Determination of Disability

Determining whether a claimant is disabled is evaluated by a five-step process. See 20 C.F.R. § 404.1520(a)-(f); Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

> The five steps are:
> (1)    If the claimant is engaged in substantial gainful activity, disability benefits are denied.
> (2)    If the claimant is not engaged in substantial gainful activity, her medical condition is evaluated to determine whether her impairment, or combination of impairments, is medically severe. If the impairment is not severe, benefits are denied.
> (3)    If the impairment is severe, it is compared with the listed impairments the Secretary acknowledges as precluding substantial gainful activity. If the impairment is equivalent to one of the listed impairments, the claimant is disabled.
> (4)    If there is no conclusive determination of severe impairment, then the Secretary determines whether the claimant is prevented from performing the work she performed in the past. If the claimant is able to perform her previous work, she is not disabled.
> (5)    If the claimant cannot do her previous work, the Secretary must determine whether she is able to perform other work in the national economy given her age, education, and work experience.

Trenary v. Bowen, 898 F.2d 1361, 1364 n.3 (8th Cir. 1990) (citing Bowen v. Yuckert, 482 U.S. at 140-42); 20 C.F.R. § 404.1520(a)-(f).

"To establish a disability claim, the claimant bears the initial burden of proof to show that he is unable to perform his past relevant work." Frankl v. Shalala, 47 F.3d 935, 937 (8th Cir. 1995) (citing Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the physical residual functional capacity (RFC) to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors such as age, education, and work experience. Id.

Under the first step of the analysis, ALJ Mathon determined that the claimant had not engaged in substantial gainful employment since her alleged onset date of February 23, 2003. At the second step, ALJ Mathon found that the claimant was impaired by mitral valve disease, mitral regurgitation, mild COPD, and depression, which she determined were severe. At the third step, ALJ Mathon determined that the claimant's impairments were not equivalent to one of the listed impairments. At the fourth step, ALJ Mathon determined the claimant had the following residual functional capacity (RFC):

> The claimant can perform light work. She can lift and carry up to 20 pounds occasionally; in an 8-hour day she can sit, stand, and walk for 6 hours each. She cannot frequently climb stairs and ladders. She must avoid even moderate exposure to lung irritants and hazards, such as machinery and heights. She must avoid concentrated exposure to temperature extremes. She is moderately limited in her abilities to socially interact and to maintain concentration and attention.

ALJ Mathon determined that the claimant is unable to perform any of her past relevant work. Based on her RFC, ALJ Mathon determined that the claimant was able to perform work which exists in a significant number in the national economy, including ticket taker and electrical assembler. Therefore, ALJ Mathon determined that the claimant was not under a disability at any time through the date of her decision.

<u>C. Weight Given to Medical Opinion Evidence</u>

1. Weight Assigned to Social Security Program Doctors' Opinions

The claimant argues that ALJ Mathon erred in determining the weight given to medical opinion evidence. First, the claimant asserts that ALJ Mathon erred in assigning no weight to the social security program doctors' mental RFC assessments. More specifically, the claimant argues that ALJ Mathon erred in failing to analyze these opinions according to the regulations and by substituting her medical opinion for those of expert psychologists.

The Code of Federal Regulations requires that ALJs must consider findings of program physicians and psychologists as opinion evidence and must evaluate their opinions by the same factors as they would for a treating physician: examining relationship, treatment relationship, supportability, consistency, and specialization. 20 C.F.R. § 404.1527. ALJs are also required to explain in their decisions the reasons for the weight given to the opinions of a program physician or psychologist. 20 C.F.R. § 404.1527(d)(2). ALJ Mathon only stated that she did not give controlling weight to Dr. Westra and Dr. Laughlin's MRFC assessments because "they were based only on review of the records, rather than by an in-person examination of the claimant, and the conclusions are too restrictive in light of the fact that the claimant has received no psychiatric treatment." (Tr. 20).

ALJ Mathon did not evaluate Dr. Westra and Dr. Laughlin's opinions according to the regulations because she failed to evaluate them based on the factors set out by 20 C.F.R. § 404.1527. While it is true that an examining relationship is one factor to be taken into account when determining what weight an opinion is given, ALJ Mathon did not point to an alternative examining doctor's opinion to which she gave weight. The only reason that ALJ Mathon gave for why she found the program doctor's opinions inconsistent with the record is that the claimant received no psychiatric treatment, therefore could not be as limited as the program doctors opined.

The court finds ALJ Mathon's characterization of the record erroneous. The medical record shows that the claimant had consistently received psychiatric treatment from 2001 through the date of the ALJ hearing. The claimant visited her family doctor, Dr. Waller, on October 2, 2001. (Tr. 177). Dr. Waller diagnosed the claimant with depression and prescribed Prozac. (Tr. 177). The claimant had follow-up appointments for her depression with Dr. Waller on November 13, 2001, and January 11, 2002. (Tr. 176). The claimant was admitted to a psychiatric clinic in April 2002 when she experienced a breakdown while on vacation in Florida. (Tr. 171). The claimant saw Dr. Narayana, a psychiatrist, from March 10, 2002, through September 30, 2002, following which she transferred her psychiatric care to Dr. Kanwar because she did not like Dr. Narayana. (Tr. 209, 220-25). The claimant underwent a psychodiagnostic mental status exam performed by Dr. Lips on January 27, 2003. (Tr. 131-34). The claimant reported to Dr. Lips that she had been seen at the Gannon Center for Community Mental Health for outpatient psychiatric and psychotherapy services from 2000 to 2001 and had been hospitalized for psychiatric episodes twice in the past. (Tr. 131). The claimant saw Dr. Kanwar on May 29, 2003 with various complaints, including depression, and Dr. Kanwar discussed his depression treatment plan with the claimant. (Tr. 209). Finally, on June 28, 2004, the claimant again visited Dr. Kanwar complaining of increased depression due to her dental health. (Tr. 278). The record shows that the claimant has consistently been in psychiatric treatment for her depression from 2001 to at least June 28, 2004. Certainly this cannot constitute "no psychiatric treatment" and cannot be a valid reason for giving no weight to Dr. Westra and Dr. Laughlin's MRFC assessments. This court agrees that ALJ Mathon failed to analyze the program doctors' opinions according to the regulations.

The claimant next argues that ALJ Mathon erred by substituting her medical opinion for those of the expert psychologists because she did not choose another less restrictive opinion after failing to give weight to the program doctors' opinions. The Eighth Circuit has held that the ALJ must not substitute her opinions for those of physicians. Ness v.

Sullivan, 904 F.2d 432, 435 (8th Cir. 1990) (citing <u>Fowler v. Bowen</u>, 866 F.2d 249, 252 (8th Cir. 1989).

ALJ Mathon found that the claimant was not limited in her activities of daily living, was moderately limited in her abilities to socially interact and to maintain concentration and attention, and had two episodes of decompensation, each of extended duration. (Tr. 17-18). ALJ Mathon presumptively relies on the opinion of Dr. Lips in making this assessment. ALJ Mathon points to Dr. Lips' analysis that the claimant suffers from major depressive disorder, recurrent and moderate, with features of anxiety and assessed her GAF at 56, which ALJ Mathon noted reflects moderate symptoms (Tr. 17). The record shows that Dr. Lips diagnosed the claimant with major depressive disorder, recurrent, moderate, with features of anxiety <u>and</u> dependent traits, with a possibility of dependent personality disorder and assessed the claimant's GAF at 56. (Tr. 133-34). ALJ Mathon relied on a portion of this diagnosis when making determinations of the claimant's mental RFC. Dr. Westra and Dr. Laughlin found the claimant to be mildly restricted in her activities of daily living and moderately restricted in maintaining social functioning and in maintaining concentration, persistence, or pace. (Tr. 165, 192). Dr. Lips found the claimant to have some difficulty with attention, concentration, carrying out instructions, and difficulty interacting appropriately with the public. (Tr. 134). These limitations would clearly support a restriction on her activities of daily life.

By failing to take into account Dr. Lips' diagnosis of dependent traits, with a possibility of dependent personality disorder, and the psychological factors found by Dr. Lips, Dr. Westra, and Dr. Laughlin that would pose a limitation on the claimant's daily living, and by failing to point to the opinion of another psychologist or physician that supported her conclusions, ALJ Mathon erred by substituting her opinion for that of a physician.

## 2. Opinion of Treating Physician

"A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citation omitted). The regulations require the ALJ to give reasons for giving weight to or rejecting the statements of a treating physician. See 20 C.F.R. § 404.1527(d)(2). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001).

The claimant argues that ALJ Mathon erred in discounting the opinions of Dr. Lewis, one of the claimant's treating physicians. More specifically, the claimant argues that the ALJ Mathon erred when she did not discuss the factors required by the regulations and that Dr. Lewis' opinions are entitled to controlling weight.

It appears from the record that Dr. Lewis was one of the claimant's treating physicians. Dr. Lewis was the claimant's cardiologist from April 3, 2002, to May 10, 2004. During that period of time Dr. Lewis saw the claimant on ten occasions and performed numerous echocardiograms and other cardiac tests. Dr. Lewis completed a cardiac RFC assessment on April 18, 2004. (Tr. 270-73). In pertinent part, Dr. Lewis assessed the claimant at a New York Heart Association functional classification of two to three and noted that the claimant was likely to experience goods days and bad days and would likely have to miss work about two days per month as the result of impairments or treatments. (Tr. 270, 273).

ALJ Mathon stated in her decision that medical expert Dr. West testified that he disagreed with Dr. Lewis as to severity of the claimant's heart condition. (Tr. 17). While this is true, ALJ Mathon's characterization of Dr. West's testimony is erroneous. ALJ Mathon stated in her findings that Dr. Lewis rated the claimant's heart disease as a class

two to three, but that Dr. West stated that the objective medical evidence supported a lower rating. (Tr. 17). This court, however, finds that the hearing transcript supports a different conclusion. Dr. West stated that, "I would say personally that she's a little closer to three than two because of her performance on that treadmill . . . I think she's a little more limited than what [Dr. Lewis is] reflecting." (Tr. 303-04).

ALJ Mathon also stated that she rejected Dr. Lewis' conclusion that the claimant is likely to be absent from work about two days per month. (Tr. 18). The only reasoning that ALJ Mathon gave for this determination was that Dr. West testified that this conclusion is speculative because nothing in the record supports a prediction of absenteeism because there is no evidence of any deterioration in the claimant's condition since the alleged onset date. (Tr. 18). However, this is not enough to satisfy the Code of Federal Regulations. Title 20 C.F.R. § 404.1527 states that generally, an examining source is to be given more weight than a source that has not examined the claimant. 20 C.F.R. § 404.1527(d)(1). In addition, more weight is to be given to treating sources "since these sources are likely to be medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. § 404.1527(d)(2). When an ALJ does not give a treating source's opinion controlling weight, as here, the ALJ is required to apply the following factors: (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treating relationship; (3) supportability; (4) consistency; (5) specialization. 20 C.F.R.§ 404.1527(d)(2)-(5).

ALJ Mathon did not explain why she chose to credit Dr. West, a medical expert witness who had never examined or treated the claimant, over Dr. Lewis, the claimant's cardiologist who had examined her numerous times over two years. ALJ Mathon did not use the factors required by the Code of Federal Regulations in determining to discredit Dr. Lewis' opinion. Thus, ALJ Mathon erred in failing to give good reasons for the weight given to Dr. Lewis' opinion and failed to follow the required factors. 20 C.F.R.

§ 404.1527(d)(2) (requiring the ALJ to "always give good reasons in [her] notice of determination or decision for the weight . . . give[n] your treating source's opinion.").

The claimant also argues that Dr. Lewis' opinions are entitled to controlling weight. An ALJ is required to give a treating physician's opinion great weight and generally a treating physician's opinion is given controlling weight. Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997) (citing Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996)); 20 C.F.R. § 404.1527(d)(2). "The opinions of a treating physician can be discounted if other assessments are supported by better or more thorough medical evidence." Id. (citing Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986)).

ALJ Mathon accepted much of Dr. Lewis' cardiac RFC assessment, but did not give weight to the portion of the assessment that stated that the claimant would be absent from work about two days per month. (Tr. 18). "It is well established that an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record." Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir. 2000) (citing Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999); Rogers, 118 F.3d at 602).

Dr. Lewis' opinion that the claimant would miss work an average of two days per month as the result of impairment or treatment is supported by the record as a whole. The claimant was receiving ongoing treatment from at least three doctors. A review of the record shows that the claimant had suffered from symptoms of daytime fatigue and leg pain which may lead to the claimant missing work an average of two days per month. ALJ Mathon did not take these symptoms into account when deciding to discredit this portion of Dr. Lewis' RFC assessment.

As early as October 2, 2001, the claimant suffered from daytime fatigue. (Tr. 177). Almost every time the claimant saw Dr. Waller or Dr. Kanwar, she complained of fatigue and daytime tiredness. (Tr. 176-77, 208-09, 217, 278). The claimant also suffered from edema in her legs which caused her great discomfort. (Tr. 161, 170, 172, 217, 274, 278). In addition, the record shows that the claimant had appointments with her various doctors

approximately two times per month from 2001-2003, for which she would have to miss work. Thus, the record supports Dr. Lewis' conclusion that the claimant would likely miss approximately two days per month due to her impairments or treatment. In addition, ALJ Mathon specifically stated she discredited the social security program psychologists because they had never personally examined the claimant. (Tr. 20). However, ALJ Mathon discredits Dr. Lewis, the claimant's treating physician for over two years, in favor of Dr. West, a medical expert who had never examined the claimant and who based his testimony on an incomplete record. (Tr. 295). This court finds that ALJ Mathon improperly discredited Dr. Lewis' opinion.

### D. Subjective Allegations of Pain

The claimant argues ALJ Mathon improperly rejected her subjective allegations of pain, fatigue, and depression. When evaluating the credibility of a claimant's subjective complaints, the ALJ may not disregard them "solely because the objective medical evidence does not fully support them." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). "The [ALJ] is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations." Id. In evaluating claimant's subjective impairment, the following factors are considered: (1) the applicant's daily activities; (2) the duration, frequency and intensity of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. Id. at 1321-22. Subjective complaints may be discounted if inconsistencies exist in the evidence as a whole. Hinchey v. Shalala, 29 F.3d 428, 432 (8th Cir. 1994); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). Where the ALJ seriously considers, but for good reason explicitly discredits a plaintiff's subjective complaints, the court will not disturb the ALJ's credibility determination. Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).

ALJ Mathon, in discrediting the claimant's credibility as to her subjective allegations of pain, noted that "[t]he claimant reports a broad range of activities of daily living. She does the laundry, makes the bed, and occasionally vacuums. . . . She carries

light bags of groceries from her car to the house and drives at least once per week."
(Tr. 18). However, ALJ Mathon did not give reasons why these daily activities were
inconsistent with functional limitations. An ALJ must set for with specificity why the
claimant's allegations of pain and fatigue are inconsistent with her ability to perform minor
daily activities. Rainy v. Dept. of HHS, 48 F.3d 292, 293 (8th Cir. 1995) ("While the
ALJ noted some activities in which Rainey could engage, the ALJ did not indicate how
these minor activities were inconsistent with Rainey's allegations of disabling pain or were
consistent with his ability to engage in light work."). "[T]o find a claimant has the
residual functional capacity to perform a certain type of work, the claimant must have the
ability to perform the requisite acts day in and day out, in the sometimes competitive and
stressful conditions in which real people work in the real world." Thomas v. Sullivan, 876
F.2d 666, 669 (8th Cir. 1989) (citing McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir.
1982) (en banc)). The ability to do light housework and drive once a week does not
qualify as the ability to engage in substantial gainful activity. Id.

Second, ALJ Mathon discredits the claimant because "[s]he contends she is
depressed and takes medication for it, but she receives no psychological treatment."
(Tr. 18). As stated previously, this conclusion is not supported by the record as a whole.
The claimant has been diagnosed with depression and other psychiatric illnesses by no
fewer than four doctors. Dr. Waller, the claimant's family doctor, diagnosed her with
depression as early as October 2, 2001, and prescribed Prozac for treatment. (Tr. 177).
Dr. Waller subsequently saw the claimant for two depression follow-ups in which he
increased the claimant's Prozac prescription on each occasion in response to no reported
improvement in her depression. (Tr. 176). The claimant was hospitalized in April 2002
when she suffered a mental breakdown while on vacation in Florida. (Tr. 171).
Dr. Narayana diagnosed the claimant with bipolar disorder and paranoia and was the
claimant's treating psychologist from May to September of 2002. (Tr. 220-22). Dr. Lips
examined the claimant on January 27, 2003 and diagnosed the claimant with major
depressive disorder, recurrent, moderate, with features of anxiety and dependent traits.

(Tr. 133-34). Dr. Lips also noted that the claimant had been hospitalized in the 1980s for psychiatric reasons and she had received psychiatric treatment at the Gannon Center for Community Mental Health in 2000 and 2001. (Tr. 131). In her review of the claimant's medical records on February 28, 2003, Dr. Westra found that the claimant had major depressive disorder and exhibited dependent traits. Dr. Laughlin came to the same conclusions in his May 23, 2003 review of the claimant's medical records. (Tr. 185-89). On May 29, 2003, the claimant transferred her psychiatric care from Dr. Narayana to Dr. Kanwar, where she has been treated since. (Tr. 209).

ALJ Mathon further discredited the claimant based on the fact that she has not heeded warnings from her doctors to quit smoking. (Tr. 18). This conclusion is supported by the record as a whole. (Tr. 174, 210, 217).

Finally, ALJ Mathon found that the claimant's assertions of pain and fatigue were not corroborated by objective medical evidence. She pointed to Dr. Lewis' cardiac RFC assessment (which she later partially discredits), in which he stated that he was not sure about the claimant's capacity to stand or sit at length, her need to take unscheduled breaks, or the percentage of the day the claimant's legs should be elevated. (Tr. 18). Dr. Lewis was sure about the claimant's ability to walk without pain and determined that she would only be able to walk two blocks without rest or severe pain. (Tr. 272). In addition, it is not clear whether Dr. Lewis' cardiac RFC assessment takes into account Dr. Kanwar's diagnosis of restless leg syndrome, which has bearing on the claimant's ability to stand or sit for extended periods of time with no movement. Finally, ALJ Mathon does not explain how this portion of Dr. Lewis' assessment creates inconsistencies in the record as a whole.

Moreover, ALJ Mathon does not explain why she discredits the claimant's assertions of fatigue, except to say that they are "not corroborated by objective medical evidence." (Tr. 18). The claimant had been treated by Dr. Kanwar for her sleep problems and daytime fatigue. (Tr. 206-08, 278-80, 284-86). Dr. Kanwar conducted a sleep study which showed that the claimant had mild obstructive sleep apnea with a sleep efficiency of 81%, which partially explained the claimant's daytime tiredness. (Tr. 286).

Dr. Kanwar also diagnosed the claimant with restless leg syndrome and prescribed Mirapex to aid in sleeping. (Tr. 209). This court finds that the claimant's assertions of pain, fatigue, and depression are consistent with the record as a whole. This court also finds that ALJ Mathon's determination that the claimant's subjective assertions of pain, fatigue, and psychiatric problems are discredited is not supported by substantial evidence in the record as a whole.

### E.  Improper Hypothetical

The claimant last argues that the hypothetical relied upon by ALJ Mathon in determining that the claimant could return to the workforce was improper because it did not completely describe the claimant's impairments.  The claimant argues that the hypothetical was incorrect because it failed to provide a detailed description of the claimant's mental limitations, and failed to account for the claimant's fatigue, drowsiness, and leg pain.  This court agrees.

An improper hypothetical cannot serve as substantial evidence.  <u>Whitmore v. Bowen</u>, 785 F.2d 262, 263–64 (8th Cir. 1986).  The hypothetical should precisely describe the claimant's impairments in order for the expert to properly evaluate the availability of jobs the claimant can perform.  <u>Newton v. Chater</u>, 92 F.3d 668, 694–95 (8th Cir. 1996).

At hearing, ALJ Mathon proposed the following hypothetical:

> Can frequently lift 10 pounds, can occasionally lift 20 pounds; avoid concentrated exposure to extreme cold and extreme heat; avoid even . . . moderate exposure to fumes, odors, and hazards, machinery, heights . . . moderate limitations on concentration and social interaction.

(Tr. 328, 334).  In response, the vocational expert testified that such a person could perform the jobs of ticket taker (702 Iowa; 112,000 national) and electric assembly (unknown Iowa; 502,000 national).  (Tr. 331, 333).

The claimant's counsel proposed an alternative hypothetical to the vocational expert, adding the following psychological limitations to the physical limitations proposed by ALJ Mathon:

> [M]oderate limitations in the following areas: ability to
> understand and remember detailed instructions; ability to carry
> out detailed instructions; further, a moderate limitation in the
> ability to maintain attention and concentration for extended
> periods; moderate limitation in the ability to work in
> coordination with or proximity to others without being
> distracted by them; moderate limitation in the ability to accept
> instructions and respond appropriately to criticism from
> supervisors; moderate limitation in the ability to respond
> appropriately to changes in the work setting; and finally,
> moderate limitation in the ability to complete a normal
> workday and workweek without interruption from
> psychologically based symptoms, and to perform at a
> consistent pace without an unreasonable number and length of
> rest periods.

(Tr. 335). In response, the vocation expert testified such a person would be
unemployable. (Tr. 336).

ALJ Mathon determined that the hypothetical proposed by claimant's counsel was
improper because she did not give controlling weight to the conclusions of the social
security program doctor's mental RFC assessments, as discussed earlier. (Tr. 20).
However, the record supports the conclusions of the program doctors.

ALJ Mathon found that the claimant would have moderate difficulties in maintaining
social functioning and moderate difficulties in maintaining concentration, persistence, or
pace. (Tr. 17-18). The program doctors found the same limitations generally, (Tr. 145,
192), but when those general categories were broken down into more specific categories,
Dr. Westra and Dr. Laughlin were able to more accurately define the claimant's functional
limitations. (Tr. 149-50, 178-79).

In the area of understanding and memory, Dr. Westra and Dr. Laughlin both found
the claimant moderately limited in her ability to understand and remember detailed
instructions. (Tr. 149, 178). In the area of sustained concentration and persistence,
Dr. Westra and Dr. Laughlin both found the claimant moderately limited in the ability to
carry out detailed instructions, the ability to maintain attention and concentration for

extended periods, the ability to work in coordination with or proximity to others without being distracted by them, and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 149, 178). Dr. Laughlin also additionally found the claimant moderately limited in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, in this area. (Tr. 178). In the area of social interaction, Dr. Westra found the claimant moderately limited in the ability to accept instructions and respond appropriately to criticism from supervisors. (Tr. 159). In this area Dr. Laughlin found the claimant moderately limited in the ability to get along with coworkers or peers without distracting them or exhibiting behavior extremes. (Tr. 179). Finally, in the area of adaptation, both Dr. Westra and Dr. Laughlin found the claimant moderately limited in the ability to respond appropriately to changes in the work setting. (Tr. 150, 179).

These conclusions are supported by the record as a whole. The only legible records from an examining psychologist come from Dr. Lips. Dr Lips explained the claimant's mental limitations in work related activities as follows:

> Symptomatically, she is having some difficulty with attention and concentration, and also exhibits some psychomotor retardation, which would reduce her ability to carry out instructions at an optimal level. At the present time, she would have some difficulty interacting appropriately with supervisors, co-workers, and the public. She is able to use good judgment, but would need time and support in responding appropriately to changes in the workplace.

(Tr. 134). Dr. Lips found nearly the same limitations upon examination as Dr. Westra and Dr. Laughlin found based on a review of the claimant's medical records.

In addition, the claimant's treating psychologist from May through September of 2002, Dr. Narayana, diagnosed the claimant with bipolar disorder and paranoia, though much of his notes are illegible. (Tr. 225).

When the claimant applied for disability benefits, the claims representative, Ms. Dardis, noted that the claimant had difficulty understanding, concentrating, and answering. (Tr. 75). She also noted that the claimant seemed confused and bewildered. (Tr. 75).

The claimant's disability application paperwork also supports the above functional limitations. She stated that she had problems completing chores because she got distracted easily and noted that she had a lot of problems concentrating and remembering (Tr. 101, 104). She also stated that she got stressed, overwhelmed, and distracted when trying to complete a task or follow directions. (Tr. 104). The claimant's mother echoed these symptoms in her third-party disability questionnaire. She noted that the claimant had problems grocery shopping, paying bills, and taking her medication due to her poor memory and difficulty keeping things straight. (Tr. 88). The claimant's mother also stated that the claimant had a lot of difficulty concentrating and remembering, adapted very poorly to change, and had difficulty making decisions. (Tr. 90).

A hypothetical "need not use specific diagnostic terms . . . where other descriptive terms adequately describe the claimant's impairment." Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). Here, it is clear that the descriptive terms used by ALJ Mathon did not adequately describe the claimant's impairments. When the broad functional areas of social functioning and concentration, persistence, or pace were broken down to more specifically define the claimant's limitations in line with Dr. Westra and Dr. Laughlin's assessments, the vocational expert changed her testimony. (Tr. 336).

"Testimony from a vocational expert is substantial evidence only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." Taylor v. Chater, 118 F.3d 1274, 1278 (8th Cir. 1997). The hypothetical introduced by the claimant's counsel contains the limitations upon which Dr. Westra and Dr. Laughlin agreed. This hypothetical completely captures the consequences that would occur in the work arena due to the claimant's limitations in the areas of social functioning and concentration, persistence, and pace. After counsel's

hypothetical was proposed, the vocation expert testified that these limitations, taken together, "would render a person unemployable." (Tr. 336). More specifically, the vocational expert testified that such a person "wouldn't be able to maintain a job on a competitive basis [and] [i]t would impair their . . . speed level of work." (Tr. 336).

While this court agrees that the record shows evidence supporting the claimant's subjective allegations of fatigue and leg pain, (Tr. 38, 101, 104-05, 170, 176-77, 205-09, 217, 225, 274, 278), it is unnecessary to discuss this at length because when only the claimant's psychological limitations were added to ALJ Mathon's hypothetical, the vocational expert testified it made the claimant unemployable. (Tr. 336). Accordingly, further vocational expert testimony as to the effects of the claimant's fatigue and leg pain on her ability to perform work is unnecessary.

This court has determined that the plaintiff is disabled based on the opinions of her treating and examining physicians and psychologists, program psychologists, the record as a whole, and the claimant's subjective allegations of fatigue, leg pain, and depression. Therefore, reconsideration of the record and vocational expert testimony would not affect the determination that the claimant is disabled. A remand would only cause an unnecessary delay in the awarding of benefits to a deserving plaintiff. As a result, a remand is not necessary in this case.

Upon the foregoing,

IT IS ORDERED that this case be resolved in favor of the claimant, and against the defendant, and remanded for an award of benefits. This court finds that the hypothetical proposed by claimant's counsel properly reflects the claimant's impairments as supported by the record.

April 10, 2006.

JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT